IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: <br> DONALD WILSON WOODS, SR., <br> a/k/a DONALD WILSON WOODS, <br> d/b/a PAPPY'S GARAGE & 24 HOUR <br> TOWING SERVICE, and MONICA <br> ANN WOODS, f/k/a MONICA ANN <br> MILLER, <br>     Debtors | CHAPTER 7 <br><br><br><br><br><br> CASE NO. 1:10-bk-01359MDF |
| ARTHUR W. DAVIS, <br>     Movant <br><br> v. <br><br> DONALD WILSON WOODS, SR., <br> a/k/a DONALD WILSON WOODS, <br> d/b/a PAPPY'S GARAGE & 24 HOUR <br> TOWING SERVICE, and MONICA <br> ANN WOODS, f/k/a MONICA ANN <br> MILLER, <br>     Respondents | |

## OPINION

Before me is the motion of Arthur Davis to dismiss the bankruptcy petition filed on February 22, 2010 by Donald Wilson Woods, Sr. ("Woods") and Monica Ann Woods (collectively "Debtors"). The current case is the third in a series of bankruptcies filed by Debtors – the first having been filed in 2008 and the second in 2009.[1] Davis' Motion alleges that Debtors' 2010 petition was filed in bad faith. For the reasons that follow, the Motion will be denied.

---

[1] Debtors filed a Chapter 13 petition on July 23, 2008 to Case No. 1:08-bk-02599RNO that was dismissed on September 10, 2009. A second Chapter 13 petition was filed on December 10, 2009 at Case No. 1:09-bk-09571MDF and was dismissed on January 25, 2010.

## I. Introduction

The background of this case includes a series of cryptic loan agreements between the parties, a series of failed bankruptcy cases filed by Debtors, and the mysterious acquisition of a business by Woods and his partner while Debtors' 2008 Chapter 13 bankruptcy case was pending. The record created at the trial of the instant matter provides scant information on how Woods acquired the business – a garage and towing service – during the pendency of a 2008 bankruptcy case. Even less light was shed on the acquisition and disposition of vehicles used in Woods' garage and towing service, which moved like so many Matchbox cars through the business.[2] The hearing on this matter concluded with many unanswered questions.

**Procedural and Factual History**

In November 2007, Woods and Orville Kibe ("Kibe"), trading and doing business as Pappy's Garage, entered into a lease agreement with Arthur W. Davis, ("Davis") to rent property in Duncannon, Pennsylvania for the operation of a garage and towing service.[3] Davis acquired the commercial property specifically intending to rent it to Woods and Kibe for the operation of their business. In late 2008, Woods and Kibe approached Davis to ask for a loan. Davis agreed to

---

[2] All told, in the three-year span encompassed by the record of this case, at least nineteen different vehicles appear in the various loan agreements between the parties and schedules filed in Debtors' bankruptcies. These include a Chevy Rollback Truck, a 2000 UD Nissan Rollback, a 1997 Ford F650 Rollback, a Prairie Schooner Camper, a 1993 Ford Truck, a 2000 Ford F350, a 2000 Ford F150 Lariot, a 1981 Honda motorcycle, a 2000 Ford Expedition, a 1996 Jeep Grand Cherokee, a 1997 Ford F850, a 1993 Ford F350 Super Duty Rollback, a 2000 Chevrolet HD towtruck, a 1998 International 4700 series, a 1988 UD Rollback, a 1992 Wabash trailer, and a 1995 Volvo Tractor diesel.

[3] The lease omitted the location of the property subject to the lease, but Davis testified at the hearing that the property was located at 101 Paradise Road, Duncannon, Pennsylvania. When the lease expired in 2009, Woods was locked out of the premises because the rent was delinquent. Kibe died at some point before the lease terminated.

2

loan Woods and Kibe $6600 under the terms of a written agreement dated November 11, 2008 ("Agreement One") signed by Woods and Kibe as the borrowers and by Davis as the lender. In Agreement One, Woods and Kibe promised to repay the loan in thirteen months in monthly installments. Agreement One contained the following provision: "To protect the Lender, I give what is known as a security interest or mortgage in: Title to 1993 Ford Rollback Truck." This loan was paid in full at some time not disclosed in the record.

On January 27, 2009, Woods and Kibe as borrowers and Davis as lender entered into a second loan agreement ("Agreement Two") for $8600 signed by Woods and Kibe as borrowers. The record does not explain how Woods and Kibe intended to use the funds. Agreement Two contained the following provision: "To protect Lender, Borrowers give a security interest or mortgage in the following assets and agrees [sic] to execute all other documents necessary or convenient to perfect or create that security interest or mortgage: Chevy Rollback Truck." The parties dispute whether or not this loan was repaid in full. It is undisputed, however, that no action was taken by any party to Agreement Two "to execute all other documents necessary or convenient to perfect or create" a security interest in the Chevy Rollback Truck in favor of Davis.     On March 31, 2009, Davis and Debtors entered into a third loan agreement ("Agreement Three") through which Davis extended to Debtors a loan in the amount of $41,000.[4] Although the record is not clear on this point, Davis states in his testimony that the purpose of the loan was to enable Debtors to acquire two vehicles – a 2000 UD Nissan and a 1997 Ford F650. Agreement Three adopted the language in Agreement Two regarding the

---

[4]Davis loaned Debtors $35,000, but the amount to be repaid was calculated at $41,000 to include interest.

3

creation of a security interest and offered the following assets as collateral: "2000 UD Nissan – 2 Car Rollback[,] 1997 Ford F650 – 4 Car Rollback[,] [Prairie Schooner] Camper – VIN #1U83POR2XMD012654[, and] 93 [sic] Ford Truck – VIN # 2FDLF47M2PCB03270." At the hearing, Woods denied that he agreed to provide a security interest in a 2000 UD Nissan, which he alleged did not exist. Woods further alleged that Davis altered Agreement Three by adding the Nissan as collateral for the loan. Woods admitted that he agreed to provide the 1997 Ford 650, the camper, and the 1993 Ford Truck as collateral, further testifying that he gave Davis the titles. However, Woods took no further action "to perfect or create" a "security interest or mortgage" as specified in the Agreements.[5] Ultimately, Debtors defaulted in their payment obligations under Agreement Three[6] and, on October 27, 2009, Davis confessed judgment against them in the Court of Common Pleas of Perry County, Pennsylvania in the sum of $38,167.57.

Debtors have filed three separate bankruptcy petitions since 2008. On July 23, 2008, five months before Woods obtained the first loan from Davis, Debtors filed a petition in Chapter 13. In the schedules Debtors listed five motor vehicles – a 2000 Ford F350, a 2000 Ford F150 Lariot, a 1981 Honda motorcycle, a 2000 Ford Expedition, and a 1996 Jeep Grand Cherokee.

---

[5] Woods denied that he ever owned a 2000 UD Nissan. Davis testified that he received "some" title documents from Woods, but not for all vehicles pledged as collateral. (N.T. 45.) Davis further testified that he had given to his prior counsel all titles he had received from Woods (N.T. 65) and retained copies in his file. However, Davis did not produce the copies of the titles at the hearing. Davis' current counsel represented to the Court that the only title in his possession was one for the 1991 Prairie Schooner Camper, which, by the time of the hearing, had been "junked." (N.T. 45.)

[6] The parties agree that Debtors defaulted on Agreement Three, but dispute the amount that is due. It is not necessary to resolve this dispute as a predicate to deciding the issue of whether or not the petition was filed in bad faith.

4

The schedules do not disclose the existence of the 1993 Ford rollback truck that Woods pledged to Davis four months later in Agreement One. The absence of the 1993 Ford from the 2008 petition indicates that: (1) Debtors did not disclose their ownership of this vehicle at the time they filed the petition; or (2) Debtors acquired the vehicle while their first Chapter 13 case was pending.[7] If Debtors purchased the vehicle post-petition, they either purchased it with cash or they failed to obtain court approval to incur debt.[8] The record in the within case does not shed light on which alternative occurred. At the time Woods obtained a second loan from Davis in January 2009, he gave a security interest in a Chevy rollback truck. This vehicle also was not included in Debtors' 2008 petition. Debtors' 2008 petition was dismissed on September 10, 2009 due to Debtors' inability to propose a confirmable Chapter 13 plan.[9]

On December 10, 2009, Debtors filed their second Chapter 13 petition. Having been ousted in October 2009 from the building he leased from Davis, Woods no longer operated a garage and towing service and was working as a truck driver. The schedule of personal property filed in the second case does not refer to any of the vehicles that were pledged to Davis in Agreement Three on March 31, 2009. In fact, it contained no entries whatsoever in the space provided for "automobiles, trucks, trailers, and other vehicles and accessories." The 2009

---

[7] The language of Agreement One leaves open the possibility that the Ford truck was owned by Kibe and not by Woods. However, the circumstances surrounding the transaction indicate that Woods was the title holder.

[8] A Chapter 13 debtor engaged in business is required by 11 U.S.C. §§ 364 and 1304 to obtain the court's authorization before obtaining post-petition credit. A court may take judicial notice of its own docket. *In re Mailman Steam Carpet Cleaning Corp.*, 196 F.3d 1, 8 (1st Cir. 1999). The docket of Debtors' 2008 case, Docket No. 1:08-bk-02599-RNO, filed in this Court contains no applications seeking post-petition financing.

[9] Between August 7, 2008 and May 18, 2009, Debtors filed six proposed Chapter 13 plans, none of which were confirmed.

5

petition was dismissed on January 25, 2010 due to Debtors' failure to file documents required by 11 U.S.C. § 521(i)(1).

On February 22, 2010, Debtors filed the current Chapter 13 petition. In the space provided on schedule B for listing "automobiles, trucks, trailers, and other vehicles and accessories," the phrase "See Attaches (sic)" was entered, but no document was attached. On May 27, 2010, Debtors filed an amended schedule B which listed the following vehicles: "2000 Ford F350 4wd crew cab (202,000 miles), 1997 Ford F850 4 car rollback car carrier (transmission out), 1993 Ford F350 Super Duty Rollback (310,000 miles), 2000 Chevrolet HD towtruck (transmission out), 1998 International 4700 series (476,000 miles), 1988 UD Rollback (264,000 miles), 1992 Wabash 53 ft trailer, 1995 Volvo Tractor diesel (1,000,000 miles +)."

The amended schedule of creditors holding unsecured non priority claims in the current petition lists twenty-one claims totaling $101,182.48. Davis is identified as holding a disputed, unsecured claim in the amount of $38,928.44 and an undisputed claim of $8086.26 with a total claim of $47,020.44.

Between March 8, 2010 and August 12, 2010, Debtors filed five proposed Chapter 13 plans, each of which proposed payments funded by Debtors' wages. The Chapter 13 trustee objected to each plan filed, and the Court denied confirmation of all five proposed plans.[10]

---

[10]Debtors' Fourth Amended Plan was filed on August 12, 2010. The Chapter 13 trustee objected to confirmation because Debtors had not provided the trustee with their 2008 and 2009 federal tax returns. Davis also objected to confirmation, averring that the plan was not feasible, that it was not proposed in good faith, and that Debtors were not submitting all of their disposable income to the trustee, as required by 11 U.S.C. § 1322(a)(1). Following the confirmation hearing on the Fourth Amended Plan, an Order was entered directing Debtors to submit their 2008 and 2009 tax returns to the trustee by November 17, 2010. Davis' objection to confirmation was continued pending the trustee's receipt of the tax returns. Debtors submitted their tax returns as required, and the trustee withdrew his objection on November 17, 2010.

On September 9, 2010, Davis filed the instant motion to dismiss Debtors' bankruptcy case. The motion was heard on June 2, 2011, and the matter was taken under advisement. On August 16, 2011, Debtors filed an election to convert their case to Chapter 7. The matter of dismissal of the case is ready for decision.[11]

## II. Discussion

Davis' Motion seeks dismissal of the case under 11 U.S.C. §1307. Section 1307 is applicable only to Chapter 13 cases, and so with the conversion of the case to Chapter 7, §1307 now is irrelevant. Nonetheless, conversion of the case does not moot the issue of whether the case was filed in bad faith. *See In re Czykoski*, 320 B.R. 385 (Bankr. N.D. Ind. 2005) (Chapter 7 debtors had absolute right to convert case to Chapter 13, but grant of debtors' motion did not deprive bankruptcy court of jurisdiction to consider pending motion to dismiss.).

A. *Legal standards to be examined in determining good or bad faith*

It is well-established in this Circuit that a bankruptcy petition filed in either Chapter 13 or Chapter 7 may be dismissed if filed in bad faith. *See Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365 (2007) (Chapter 13 cases); *In re Tamecki*, 229 F.3d 205 (3d Cir. 2000) (Chapter 7 cases). The same standard is applied regardless of the chapter in which the case was filed. *See In re Mitchell*, 357 B.R. 142, 153 (Bankr. C.D. Cal. 2006) ("standards for bad

---

Thereafter, several hearings on Davis' objection were scheduled, but were continued to allow Davis to examine Debtors under Fed. R. Bankr. P. 2004 and because Debtors obtained new counsel.

[11] I have jurisdiction pursuant to 28 U.S.C. §§157 and 1334. This matter is core pursuant to 28 U.S.C. §157(b)(2)(A) and (O). This Opinion and Order constitutes findings of fact and conclusions of law made pursuant to Federal Rule of Bankruptcy Procedure ("Fed. R. Bankr. P") 7052, which is applicable to contested matters pursuant to Fed. R. Bankr. P. 9014.

7

faith dismissal used in Chapter 11 and Chapter 13 cases should, to the extent possible, also apply in Chapter 7 cases via § 707(b)(3)(A)"); *In re Boyce*, 446 B.R. 447, 451-52 (D. Or. 2011) (also referencing Chapter 12 cases); *In re Cardona-Pereira*, 2010 WL 500404, *3-4 (D. N.J.); *In re Siegenberg*, 2007 WL 6371956, *3 (Bankr. C.D. Cal). "[S]tandards for bad-faith dismissal should be the same under each chapter, because 'the harm of filing a voluntary petition in bad faith is essentially the same' regardless of chapter and 'creating a variety of bad faith standards . . . would be unnecessarily confusing and would only encourage potential bad-faith filers to choose the chapter of the Code that appears to have the most favorable bad faith test.'" *In re Cardona-Pereira*, 2010 WL 500404, at *3 (quoting *In re Mitchell*, 357 B.R. at 153-54).

Section 707 includes two provisions that provide for the dismissal of a case filed in bad faith. Section 707(a) provides that a case may dismissed for "cause." Explicit examples of cause include unreasonable delay, the failure to pay court fees, or the failure to file schedules and statements required under § 521(a). 11 U.S. C. § 707(a). Section 707(a) does not state explicitly that a debtor's bad faith provides cause for dismissal, but in this Circuit, it is settled that a bankruptcy case may be dismissed under § 707(a) if "the petitioner fails to demonstrate his good faith in filing." *In re Tamecki*, 229 F.3d at 207. Whether or not a case is filed in good faith is determined by considering the totality of the circumstance. *Perlin v. Hitachi Capital America Corp. (In re Perlin)*, 497 F.3d 364, 372 (3d Cir. 2007). Section 707(b)(3), which applies only to cases filed by an individual debtor whose debts are primarily consumer debts, provides that when deciding whether a Chapter 7 case should be dismissed, a court should consider "whether the debtor filed the petition in bad faith." Because Davis' motion was heard before Debtors' case was converted to Chapter 7, the parties did not have an opportunity to address whether or not the

8

claims against Debtors are primarily consumer debts. Although Debtors' amended schedules suggest that they are, the Court will only analyze whether the case should be dismissed under § 707(a), which applies to both consumer and non-consumer debtors.

Once a movant "calls into question" a debtor's good faith, the burden shifts to the debtor to produce evidence that the case was filed in good faith. *In re Tamecki*, 229 F.3d at 207. Although a movant may succeed in shifting the burden to a debtor, when considering dismissal of a case, a bankruptcy court must always keep in mind that dismissal for lack of good faith is a narrow doctrine. *In re Glunk*, 342 B.R. 717, 732 (Bankr. E.D. Pa. 2006) (citing *In re Tamecki*, 229 F.3d at 209). A finding that a petition was not filed in good faith "'should be confined carefully and is generally utilized only in . . . egregious cases that entail concealed or misrepresented assets and/or sources of income, lavish lifestyles, and intention to avoid a large single debt based upon conduct akin to fraud, misconduct or gross negligence.'" *Id,* 229 F.3d at 207 (quoting *In re Zick*, 931 F.2d 1124, 1129 (6th Cir. 1991)).

Applying the general guidance of *Tamecki* to a fifteen-factor test set forth in *In re Keobapha*, 279 B.R. 49, 52 (Bankr. D. Conn. 2002), the bankruptcy court in *Glunk* suggested an alternative test consisting of the five following factors:

   1. the debtor's (extravagant) lifestyle and ability to pay[;]

   2. the disproportionate impact that bankruptcy relief would have on one particular creditor, or only a few creditors, as compared to other creditors[;]

   3. forum shopping or efforts to manipulate the judicial process to thwart the orderly determination of a creditor claim pending in another court[;]

   4. prepetition fraudulent conduct to place assets beyond the reach of creditors or less than full and candid disclosure in the bankruptcy process itself[; or]

   5. an end result, if bankruptcy relief is permitted, that is perceived to be

9

fundamentally unfair or excessive.

*In re Glunk*, 342 B.R. at 734. As the *Glunk* Court observed, the presence of any of these factors may be legally sufficient, by itself, to justify dismissal of a Chapter 7 case. *Id.* at 735.

    B.    *Application of the* Glunk *factors*

        1.    *extravagant lifestyle and ability to pay*

No evidence was presented suggesting that Debtors enjoy an extravagant lifestyle or have the ability to repay their debts. To the contrary, Davis argued that Debtors had insufficient income to fund a Chapter 13 plan. Accordingly, the first factor does not apply in the within case.

        2.    *disproportionate impact on particular creditors*

As to the second *Glunk* factor, Davis asserts that Debtors' current bankruptcy petition was filed for the sole purpose of frustrating Davis' collection efforts. Davis essentially argues that Debtors filed their December 2009 bankruptcy petition to prevent Davis from executing on a judgment obtained by confession two months before the filing. Even if true, I give limited weight to this assertion. As the bankruptcy court noted in *Glunk*, "[f]requently, the need for bankruptcy relief is caused by one particular event that upsets the equilibrium in a debtor's pre-bankruptcy economic life." *Id.* at 736. This disruption may make it impossible for a debtor to immediately repay one large debt. In this case, Davis holds the largest unsecured claim against Debtors – $47,020.44. But with total unsecured claims totaling $101,182.48, and their home mortgage in default, Debtors had numerous other reasons for seeking relief in the bankruptcy court. For example, the entry of Davis' judgment coincided with the loss of leased premises and, thus, impeded Woods' ability to operate the garage and towing service. Even if the entry of the confessed judgment triggered the filing of the bankruptcy petition, I find that this factor alone is

10

not sufficient to justify dismissal of the case.

        3.     *forum shopping or manipulation of the judicial process*

The third *Glunk* factor is whether a debtor engaged in forum shopping or otherwise attempted to manipulate the judicial process to thwart the orderly determination of a creditor's claim pending in another court. The classic example of this behavior is described in *In re Myers*, 491 F.3d 120 (3d Cir. 2007). In *Myers*, the debtor filed a Chapter 13 petition after the state court announced its intention to rule against the debtor. The bankruptcy court found that the primary purpose of the debtor's bankruptcy filing was to stop an adverse ruling on a fraudulent conveyance claim that constituted the vast majority of her debt. The court also found that the debtor took other actions in violation of a state court order and that she did not meet the criteria for filing a Chapter 13 petition. *Id.* at 125.

In this case, Woods and Davis entered into three loan agreements while Debtors were in bankruptcy. Davis was only able to enter judgment against Debtors because their first petition was dismissed after they failed to make payments to the Chapter 13 trustee. Debtors were experiencing financial problems when Davis extended the loans, which he had to have known or easily could have determined. The situation in the within case is nothing like that which occurred in *Myers*. Therefore, I find that the evidence offered is inadequate to support the allegation that Debtors filed their petition to manipulate the judicial process or to obtain a more favorable forum. Accordingly, the third *Glunk* factor is not satisfied.

11

4. *fraudulent pre-petition conduct and inadequate disclosure in bankruptcy process*

Fraudulent conduct undertaken to place assets beyond the reach of creditors before a petition is filed or less than full and candid disclosure in the bankruptcy process constitute grounds for dismissal of a Chapter 7 case. Debtors represented in Agreement Three that they would pledge certain vehicles as collateral for the loan. In their 2008 and 2009 cases, Debtors failed to accurately and completely disclose their assets or to report pre-petition transfers. The instant case is tainted by similar circumstances.

Debtors' original schedule of personal property referenced, but omitted, an attachment listing their vehicles. An amended schedule filed on May 27, 2010 discloses several trucks and a trailer, but omits the 2000 UD Nissan and the camper that served as collateral for Agreement Three in March 2009. The omission of the camper is explained in the amended statement of financial affairs, which reports that the vehicle was "junked" on some unspecified date. But there is no reference in the schedules or statements to the 2000 UD Nissan. At the hearing on Davis' Motion, Woods alleged that Agreement Three had been altered by Davis to add the 2000 UD Nissan as collateral and that no such vehicle existed.[12] The Court is unable to determine if Woods owned this vehicle and failed to disclose it on his schedules in the within bankruptcy or if he did not own such a vehicle at all. However, the Court does not find credible Woods representation that Davis altered the provisions of Agreement Three.

Also unexplained is the disposition of the Chevy truck that Woods offered as security for Agreement Two on January 27, 2009. Woods also obtained this second loan from Davis during

---

[12]Woods admitted that he owned a 1988 UD Nissan that he used for parts, which was included in the amended schedules.

12

the pendency of Debtors' second bankruptcy case without court approval. In the answer to the within Motion, Debtors allege that the Chevy truck was sold more than two years before the petition filing date (February 22, 2010), which would place the transfer of the vehicle more than a year before the date upon which it was offered as collateral. Considering this contradictory testimony, the Court must conclude that Debtors either misrepresented when the vehicle was transferred in their Answer or Woods misrepresented his ownership of the vehicle when he signed Agreement Two.

Based on this evidence of contradictory and incomplete disclosure, the Court finds that Woods engaged in a pattern of deceptive conduct. He failed to fully disclose assets, entered into financing agreements without court approval, and promised to provide security for loans and then made no effort to perfect the liens.[13] Woods' pre-petition conduct was, at best, misleading. Although the record is unclear on this point, Debtors may not have even owned the vehicles that they purported to offer as security for the loans. At this point, I note that while both Debtors signed the schedules and statements in their bankruptcy cases and signed Agreement Three, Monica Woods did not testify at the hearing and Davis did not allege that she was involved in the negotiation of the loan agreements. No evidence was offered that the "missing vehicles" –

---

[13]Under Pennsylvania law, an enforceable security interest is created and attaches when the debtor executes a security agreement that contains a description of the collateral, value has been given and the debtor has rights in the collateral. 13 Pa. C.S.A. § 9203(b); *Matter of Tressler,* 771 F.2d 791 (3d Cir.1985); *Kendrick v. Headwaters Production Credit Association,* 362 Pa. Super. 1, 523 A.2d 395 (1987). A security interest in a motor vehicle is perfected when the Pennsylvania Department of Transportation receives the following: (a) an application specifying the lienholder's name and address; (b) the appropriate fee; and (c) the manufacturer's statement of origin or the existing certificate of title for the vehicle. 75 Pa. C.S.A. § 1132.1. I do not find credible Woods' statement that he gave titles to all vehicles subject to Davis' security interest to Woods. The only title Davis' counsel had in his possession was the title to the camper.

the camper, the 2000 UD Nissan and the Chevy rollback – were titled in her name. Thus, I am unable to conclude that Monica Woods was involved in the same deceptive conduct as her husband.

As set forth in the Procedural and Factual History, the events relevant to Davis' Motion began in one bankruptcy case, moved through a second case, and concluded in a third. One bankruptcy court has held that a debtor's "behavior in . . . prior cases is only of limited relevance" to a question regarding the debtor's good faith in a current case. *In re Barrett*, 149 B.R. 494, 501 (Bankr. N.D. Ohio 1993) (debtor was sanctioned for "abuse [of] the bankruptcy system" in prior case, but sanctioned behavior was only marginally relevant to good faith of current chapter 13 plan). However, other courts have held that "[a] debtor's actions regarding a pending case and any previous cases are relevant to a dismissal determination" under 11 U.S.C. § 707(a). *In re McDaniel*, 350 B.R. 616 (Bankr. M.D. Fla. 2006) (citing *In re Simmons*, 200 F.3d 738 (11th Cir. 2000) (deciding motion filed by debtor to dismiss his own chapter 7 case, court examined debtor's conduct in filing prior cases).

The relevance of behavior in a prior case varies according to the circumstances of the pending case. In the instant case, actions taken by Woods in the two prior cases are particularly relevant to the current inquiry because the debt at issue arose during a prior case. If the instant petition fully disclosed assets of the estate and the disposition of assets transferred pre-petition, prior omissions would be afforded little weight, but the failure to adequately explain the current status of the 2000 UD Nissan and the Chevy truck smacks of fraud. Accordingly, I find that the fourth *Glunk* factor is satisfied.

*5.    end result that is fundamentally unfair or excessive*

The final *Glunk* factor focuses on whether it would be fundamentally unfair to permit a debtor to obtain relief in Chapter 7. There are several issues I must consider. First, the Motion was filed against both Debtors. There is inadequate evidence in the record to support dismissal of Monica Woods' Chapter 7 petition. Although she signed Agreement Three, no evidence was offered that Monica Woods was involved in Woods' business and knew of the omissions in the schedules. Therefore, it would be fundamentally unfair to dismiss her case. Second, after the hearing in this matter, Davis filed a complaint to except from discharge the debt arising from the judgment he obtained against Debtors. Therefore, Davis will have an opportunity to obtain a judicial determination of whether his claim arose from fraud or willful and malicious conduct, which prompted the filing of the Motion to Dismiss. Having determined that there are additional avenues Davis can pursue to obtain relief, I find that the fifth *Glunk* factor does not support dismissal of the case.

### III. Conclusion

Davis has produced sufficient evidence to shift the burden to Woods to prove that his case was filed in good faith. Although there is strong support for dismissal of Woods' petition based upon his pre-petition conduct and failure to disclose all relevant information about Debtors' assets and liabilities, when the other *Glunk* factors are considered, as well as the ability of Davis to obtain a remedy through the adversary proceeding, I find that dismissal of Woods' case is not warranted.  Further, Davis failed to produce sufficient evidence to shift the burden to

15

Monica Woods to prove that her case was filed in good faith. Therefore, the motion to dismiss Debtors' bankruptcy case will be denied. An appropriate Order will be entered.

By the Court,

_Mary D France_
Chief Bankruptcy Judge

Date: October 11, 2011